Argued and submitted November 3, reversed in part, affirmed in part December 28, 1983, petition for rehearing denied April 10, 1984

### WELCH,
*Respondent on Review,*

*v.*

### BANCORP MANAGEMENT ADVISORS, INC. et al,
*Petitioners on Review.*

(TC A7606-98609, CA A20958, SC 28800)

675 P2d 172

William M. McAllister, Portland, argued the cause for petitioners on review. With him on the petition and brief were Gregory R. Mowe and Joyce Ann Harpole, and Stoel, Rives, Boley, Fraser and Wyse, Portland. Also on the brief in the Court of Appeals was Charles F. Adams, Portland.

Mildred Carmack, Portland, argued the cause for respondent on review. With her on the response and briefs were John R. Faust, Jr., and Schwabe, Williamson, Wyatt, Moore and Roberts, Portland.

Before Lent**, Chief Justice, and Linde, Peterson***, Tanzer****, Roberts and Carson, Justices.

CARSON, J.

---

** Chief Justice when case was argued.

*** Chief Justice when this decision rendered.

**** Tanzer, J., resigned December 31, 1982.

## CARSON, J.

This case involves a claim for tortious interference with a contract for real estate financing executed by plaintiff, a real estate developer, and U.S. Bancorp Realty and Mortgage Trust, a real estate investment trust, dba U.S. BanTrust (the Trust). The Trust is not a party to this litigation. Apparently, because the Trust had no staff, defendant Bancorp Management Advisors, Inc. (BMA) had an agreement with the Trust to provide investment advice. As a part of its activity, BMA formed an Investment Committee that had all the investment powers of BMA. The Investment Committee, according to plaintiff, was comprised of key employes of the three defendant investment and banking corporations (the banks). It is the Investment Committee and its relationship to the Trust on the one hand and to the banks on the other that is at the heart of plaintiff's case before us.

Two questions are presented in this appeal. The first concerns the scope of an agent's privilege to advise the principal to breach a contract where the agent's advice furthers the interests of that principal and the interests of another principal of the agent, as well. The second issue is procedural: Whether, in an action for intentional interference with contract, allegations of misrepresentation to one party to the contract arise out of the same conduct, transaction, or occurrence as alleged misrepresentations to the other party, for purposes of ORCP 23 C. and the relation back of an amended complaint.

### FACTUAL BACKGROUND

The financial setting within which this controversy swirls is simply stated as a method by which one or more lenders (the banks) make money available to a real estate investment trust (the Trust) for funding real estate development projects by one or more borrowers (plaintiff).

In 1974, plaintiff and the Trust executed a contract whereby the Trust agreed to provide financing for the purchase and rezoning of a parcel of undeveloped real property in Washington County. In exchange for providing the financing, the Trust was to receive a mortgage on the property, interest on the sum borrowed, and one-half the net profit when the property ultimately was sold. As part of the contract, plaintiff

was to submit a proposed zone change application to the Trust for approval, which plaintiff did. The Trust, however, acting on the advice of the Investment Committee, rejected the proposal and then refused to make the loan.

In litigation in 1976, after a jury trial, plaintiff recovered a judgment against the Trust for breach of the contract to provide funds for the proposed real estate development. That judgment was affirmed on appeal in *Welch v. U.S. Bancorp,* 286 Or 673, 596 P2d 947 (1979).

The present case is an action by plaintiff against BMA and the banks which resulted in a summary judgment for defendants, which was reversed by the Court of Appeals, 57 Or App 666, 646 P2d 57 (1982).

Plaintiff contended that the BMA Investment Committee, while acting as advisers to and agents of the Trust, intentionally made certain misrepresentations and gave false advice to the Trust, and that in so doing, the Investment Committee was primarily motivated by its members' interests as agents of the banks, which interests were inconsistent with the interests of the Trust. Plaintiff claimed that these agents owed duties simultaneously to the Trust and to the banks. Plaintiff also alleged that the Investment Committee intentionally misrepresented to plaintiff that if the proposed zone change application were submitted in a particular form, the application would be approved by the Trust. Plaintiff sought to recover for lost profits (less the amount previously received from the Trust in the breach of contract action), out-of-pocket expenses incurred, and exemplary damages.

Defendants moved for summary judgment as to plaintiff's first claim for relief, submitting in support of their motion extensive committee minutes and transcripts of testimony as to the deliberations of the Investment Committee. The evidence before the trial court disclosed that members of the Investment Committee had commented that the interest rate on the proposed loan to plaintiff was less than the cost of money to the Trust, that the loan might appear speculative to the banks, and that the banks would not look favorably on the Trust's commitment to plaintiff.

Exhibits submitted with defendants' motion for summary judgment disclosed that the Investment Committee had

decided not to approve the proposed zone change application because the Trust had expected that a larger portion of the development would be put to commercial use and because plaintiff had not presented the Investment Committee with adequate figures to determine the value of the project. In a letter from the Trust to plaintiff, the Investment Committee explained that the value of the development did not provide a sufficient margin over acquisition, financing, and development costs to justify the risks involved.

In opposition to the motion for summary judgment, plaintiff provided evidence that an Investment Committee member had said that the nationwide collapse of real estate investment trusts in 1974 prevented affiliated banks from marketing commercial paper for loans to real estate investment trusts. Furthermore, if many such loans were made, the banks' Standard & Poor and Moody ratings would decline because rating agencies generally disapproved of such loans to real estate investment trusts at that time.

Plaintiff argued that this discussion of a nationwide situation raised the inference that the Investment Committee's concern for the banks' own credit ratings was their *primary motive* for advising the Trust to breach its contract with plaintiff. Defendants contended that reference to commercial paper was not significant because there was no agreement that commercial paper credit would be used to fund plaintiff's project, and that, on the contrary, other lines of bank credit were available to be extended to the Trust to finance this project, despite the withdrawal of short-term commercial paper funds for such loans. These back-up lines of credit would have been more expensive to the Trust than commercial paper credit; but plaintiff did not dispute that other lines of credit were available if the Trust had chosen to proceed with the project.

After oral argument and review of extensive documentation, the trial court granted defendants' motion for summary judgment on plaintiff's first claim for relief, relying on *Wampler v. Palmerton,* 250 Or 65, 439 P2d 601 (1968), and granted defendants' motion to dismiss plaintiff's "second cause of action," as set forth in plaintiff's Fifth Amended Complaint, as being time-barred.

Plaintiff appealed, contending that the granting of summary judgment on his first claim for relief was error because the doctrine of *Wampler v. Palmerton, supra,* does not require judgment for defendants as a matter of law, citing *Straube v. Larson,* 287 Or 357, 600 P2d 371 (1979); *Seeborg v. General Motors Corporation,* 284 Or 695, 588 P2d 1100 (1978). Plaintiff argued that there was a genuine issue of material fact as to the Investment Committee members' motives and that defendants did not establish that the Investment Committee employed only proper means nor that they acted with proper motives when they induced the Trust to breach its contract with plaintiff. Plaintiff further contended that his "second cause of action" was improperly dismissed, because it related back to the date the action was commenced and thus was not barred by the statute of limitations.

The Court of Appeals reversed and remanded. It held that absent full disclosure of the conflict of interest at the time the advice is given, agents are subject to liability for interference with contract if plaintiff can prove that the Investment Committee's primary motive in advising the Trust to breach its agreement was to benefit the banks rather than the Trust. *Welch v. Bancorp Management Services, supra,* 57 Or App at 673. The Court of Appeals determined that to hold otherwise would immunize corporate entities whose agents have given advice to breach a contract, ostensibly to benefit the advisee, but in reality to benefit another principal with a conflicting interest. *Id.* After determining that the Investment Committee's primary motive in advising the Trust to deny approval of the proposed zoning application was a key factual issue, the Court of Appeals remanded for a determination of that issue at trial.

Defendants claim that the Court of Appeals' "primary motive test" is erroneous and, further, that disclosure of an agent's conflict of interest to the principal logically is irrelevant to the issue of the agent's liability to a third party for advice given to the principal. Defendants contend that the proper legal test, set out in *Wampler v. Palmerton, supra,* is: If the agent is acting within the scope of his authority for the benefit of the principal, there can be no liability regardless of the agent's motive. Advising a breach of contract under those circumstances is a privileged or justified act.

Defendants argue that a test which focuses on primary motive could result in liability even where the purpose, intent, and effect of the agent's advice is to benefit the principal. If the agent's motive is relevant at all, they maintain, liability should result only where the agent's motive is adverse to the interests of the principal.

Defendants also seek review of the Court of Appeals' holding that plaintiff's second claim for relief for misrepresentation relates back to the filing of the original complaint.

## I. AGENT'S LIABILITY TO THIRD PARTY FOR TORTIOUS INTERFERENCE WITH CONTRACT.

In several recent cases, this court has addressed the issue of an agent's privilege to advise his principal to breach a contract where the agent's advice is prompted, at least in part, by selfish interests.

In *Wampler v. Palmerton, supra,* this court held that the managing officer and the business adviser of a corporation[1] who, for the benefit of the corporation, induced the corporation to breach its contract with a third party, were not liable to the third party for interfering with the third party's contract with the corporation. The plaintiff in *Wampler* alleged that the defendants, by inducing the corporate breach of contract, intended to enrich the corporation and thereby indirectly to improve their own financial conditions.

In *Wampler,* we said that a person who interferes with a contract is not always responsible for the resultant injury. When the person acts to promote "* * * an interest which is equal or superior in social value to that with which he interferes, his actions are said to be privileged or justified." 250 Or at 74.

"In the usual interference with a contract situation, the person interfering is a complete stranger to the contractual relationship. A complicating ingredient is added where the party induced to breach its contract is a corporation and the third person who induces the breach is not a stranger, but is a

---

[1] One defendant was the corporation president managing officer, a member of its board of directors and a stockholder. The other defendant was employed by the corporation as a business adviser, was an unsecured creditor of the corporation for $200,000 and a co-signer of its performance bond on the contract with which tortious interference was alleged to have occurred.

person who, by reason of his position with the corporation, owes a duty of advice and action to the corporation. * * *

"A corporation can only act upon the advice of officers or employes and through the actions of agents. Doing business through corporate structures is a recognized and necessary incident of business life. A party is usually able to abandon a disadvantageous but valid contract and be responsible for breach of contract only. Corporations would substantially be prevented from similarly abandoning disadvantageous but valid contracts, and from securing related business advice, if the officers and employes who advised and carried out the breach had to run the risk of personal responsibility in an action for interference with contract. Therefore, courts have tended to shield such persons from responsibility for inducing breach of the corporate contract, often saying that they are not liable if the action was taken in 'good faith' and for the benefit of the corporation." 250 Or at 74-75.

Further, we said that when officers or employes of a corporation induce the corporation to breach its contract with a third party in order to serve interests other than those of the corporation, then the officers and employes are not immune from personal liability in an action for tortious interference with that contract. Thus, to enjoy immunity, a corporate officer or employe must be acting within the scope of his employment and acting with the intent to benefit the corporation. 250 Or at 76-77.

This court addressed the question whether lack of good faith exists where the selfish motivation of the corporate official or employe for inducing the corporate breach is to secure derivative benefits from the improved financial condition of the corporation. We noted that most corporate officers and employes have some personal interest in the financial welfare of their principal. Thus, if good faith were equated with lack of any selfish interest in enhancing the financial condition of a corporation, most officers or employes would not dare to give the business advice that it is their duty to render. Therefore, we held that good faith means no more than intent to benefit the corporation and is not equated with absence of a personal interest in the financial welfare of the corporation. *Wampler v. Palmerton, supra,* 250 Or at 76.[2]

---

[2] We cited *Burr v. American National Theatre & Academy,* 103 NYS2d 589, 592-93 (Sup Ct), *aff'd* 278 App Div 908, 105 NYS2d 901 (1st Dept 1951) which held

In *Straube v. Larson, supra,* a radiologist brought suit to recover damages against the chief hospital administrator, another radiologist, and two residents-in-training for wrongful interference with the plaintiff's business relationship with the hospital. The plaintiff introduced evidence that the defendants testified falsely at the original hearing to facts detrimental to the plaintiff, which facts were the basis for the suspension of plaintiff's hospital staff privileges. From this, we held that the jury could infer that the defendants testified from an improper motive (to injure plaintiff).[3] We concluded that a jury could find that the defendants' complaint was a cause of the plaintiff's summary suspension and that the defendants were motivated by a desire to "get even" with the plaintiff because of the plaintiff's past mistreatment of them. Thus the evidence presented an issue of fact for the jury.

The analysis in *Straube* is not applicable to the present case because *Straube* concerned "malicious" motives, in the sense of spite or ill will and a desire to do harm for its own sake. Especially in the employment contract context, there is general agreement that a purely "malicious" motive, in the sense of spite and a desire to do harm for its own sake, will make the defendant liable for interference with contract. Prosser, Law of Torts § 129, 943 (4th ed 1971). In the present case, the recitals of malice in plaintiff's complaint were unsupported by specific facts as required by ORCP 47 D. to defeat plaintiff's motion for summary judgment.

■ In deciding the present case, the Court of Appeals borrowed its primary motive test from the primary motive concept used to uphold qualified privilege in the defamation context. We disagree that this is the proper test where agents who induce a breach of contract act from "mixed motives" to serve two principals. The granting of the summary judgment was appropriate.

We reaffirm that the proper test is whether the agent acts within the scope of his authority and with the intent to

---

that the personal interest of the agent must be adverse to the interests of the corporation to remove the privilege.

[3] There was testimony that the plaintiff had antagonized many people in the radiology department who were critical of him. There was evidence from which the jury could find that the defendants developed an intense dislike for the plaintiff. There never was any question about his technical competence.

benefit the principal.[4] When this test is met an agent is not liable to a third party for intentional interference with contract even if the agent acts with "mixed motives" to benefit himself or another principal as well.[5] The Restatement of the Law (Second) Torts, § 772 (1979), states:

> "One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person
>
> "(a)   truthful information, or
>
> "(b)   honest advice within the scope of a request for the advice."

Comment c to § 772 says in part:

> "The rule as to honest advice applies to protect the public and private interests in freedom of communication and friendly intercourse. In some instances the rule protects * * * the investment * * * counselor * * *. The only requirements for its existence are (1) that advice be requested, (2) that the advice given be within the scope of the request and (3) that the advice be honest. If these conditions are present, it is immaterial that the actor also profits by the advice or that he dislikes the third party and takes pleasure in the harm caused to him by the advice."

Comment e to § 772 says in part:

> "It is sufficient for the application of this rule that the actor gave honest advice within the scope of the request made * * * no more than good faith is required."

---

[4] The following cases from other jurisdictions support a test based on the agent's good faith intent to serve the interests of the principal: *Lyon Ford, Inc. v. Ford Marketing Corporation,* 337 F Supp 691, 694 (EDNY 1971); *Tye v. Finkelstein,* 160 F Supp 666 (D Mass 1958); *Republic of Italy v. De Angelis,* 206 F2d 121, 131 (2d Cir 1953) (Clark, J., concurring); *Ong Hing v. Arizona Harness Raceway, Inc.,* 10 Ariz App 380, 459 P2d 107, 115 (1969); *Worrick v. Flora,* 272 NE2d 708, 711 (Ill App 1971); *Phillips v. Montana Ed. Ass'n,* 610 P2d 154, 158 (Mont 1980); *Olympic Fish Products, Inc. v. Lloyd,* 93 Wash2d 596, 611 P2d 737, 739 (1980).

[5] We applied this test of acting in good faith in the corporate interest in *Wampler v. Palmerton, supra,* and although *Wampler* is distinguishable on its facts from the present case, the rule of law it espoused is applicable here. In *Wampler,* the agents benefited personally, but derivatively, from the corporation's improved financial position following the breach of contract. Here, the agents are alleged to have benefited another principal (the banks), as well as the Trust they were employed to advise. The result is the same.

■ We hold that the privilege of a financial adviser is analogous to the qualified privilege of a corporate officer or employe. *See* Restatement, *supra,* § 772, Comment c. An agent acting as financial adviser is thus privileged to interfere with or induce breach of the principal's contracts or business relations with third parties, as long as the agent's actions are within the scope of his employment and taken with an intent to further the best interests of the principal. If this two-prong test is met, it is immaterial that the agent or another principal also profits by the advice. However, where an agent-financial adviser acts against the best interests of the principal or acts solely for his own benefit, he is liable in tort for harm done to the other contracting party.

■ We agree with defendants that disclosure to the principal of an agent's conflict of interest is not part of the test of the agent's liability to a third party for advice given to the principal. While such disclosure could make a difference to the principal who is deciding whether to take the advice and breach the contract, this disclosure or non-disclosure is only relevant to the injured third party when it is evidence of the agent's intent to benefit the principal. Disclosure, where there is no intent to benefit the principal, will not sustain the privilege, any more than non-disclosure, where intent to benefit the principal is clear, will destroy the privilege.

Defendants ask this court to reverse the Court of Appeals and affirm the trial court's summary judgment in their favor. ORCP 47C. authorizes a grant of summary judgment if there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law. The moving party has the burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *Seeborg v. General Motors Corp., supra.*

■ In considering whether to grant a motion for summary judgment, the court, generally, must draw all inferences of fact from the depositions and affidavits against the moving party and in favor of the party opposing the motion. *Uihlein v. Albertson's, Inc.,* 282 Or 631, 634, 580 P2d 1014 (1978). This is true even as to those issues upon which the opposing party would have the burden at trial. *Seeborg v. General Motors*

*Corp., supra,* 284 Or at 699. The question of a corporate officer's intent is one of fact.

■ We turn now to the facts of this case. Applying the two-prong test set out above, there is no evidence that the Investment Committee acted outside the scope of its authority in advising the Trust. In fact, in paragraph XI of the first count of plaintiff's Fifth Amended Complaint, he asserts that defendants' actions were within the scope of their actual and apparent authority.

As for the second prong, we find that there is no genuine issue of material fact to dispute that the advice given by the Investment Committee to the Trust was given with the intent to benefit the Trust. Plaintiff's exhibits do raise a possible factual dispute over the issue for whose benefit the commercial paper line of credit was withdrawn from the Trust. There is credible evidence that commercial paper credit was not made available to the Trust because the banks were concerned with their own credit ratings. However, there is no evidence that this factual dispute was material to the breach of contract. Defendants contend, and plaintiff does not controvert, that other lines of credit were available to the Trust, albeit at a higher cost. The exhibits accompanying and contesting the summary judgment motion did not show that the banks were obligated to loan particular funds to the Trust at any agreed-upon rate of interest.

■ Taking plaintiff's evidence in the light most favorable to him, if the banks were not inclined to loan money from commercial paper lines of credit to the Trust because of concern for their own ratings, the most that can be said is that the banks were not inclined to loan any funds to the Trust at an interest rate which would make the development project profitable. There was evidence that interest rates were rising during this time.

The evidence in defendants' exhibits was enough for the trial judge, who also presided over the prior breach of contract trial, to determine that the Investment Committee was acting in the best interests of the Trust. The evidence when viewed in the light most favorable to plaintiff, shows that defendants did meet their burden of proving that they acted within the scope of their authority as advisers to the Trust and that they acted to benefit the Trust, even if they

benefited the banks as well. The trial judge applied the correct legal analysis and summary judgment was properly granted.

This segment of the Court of Appeals' opinion, reversing the trial court, is reversed.

## II. **RELATION BACK OF THE AMENDED COMPLAINT.**

We also allowed review to consider whether plaintiff's second allegation of misrepresentation stated in his Fifth Amended Complaint relates back to the date that the original complaint was filed or whether it is barred by the statute of limitations, as the trial court held.

The original complaint, filed in June, 1976, contained allegations of defendants' misrepresentations *to the Trust*. A Fourth Amended Complaint, filed in May, 1978, after the two-year statute of limitation period had expired (ORS 12.110(1)), for the first time made additional allegations as to defendants' misrepresentations *to plaintiff* during approximately the same period. Plaintiff did not allege any new damages arising out of the second alleged misrepresentation.

In the Fifth Amended Complaint, filed in April, 1980, the misrepresentation to plaintiff was termed a second "cause of action." During oral argument before the Court of Appeals, counsel for plaintiff characterized the second "cause of action" for misrepresentation as more in the nature of another count of the underlying claim for relief for intentional interference with contract. The Court of Appeals agreed with that characterization and so do we. The Court of Appeals correctly noted that whether the alleged material misrepresentations, if proven, were to the Trust on the one hand or to plaintiff on the other, such misrepresentations would tend to establish defendants' intentional interference with the contract between plaintiff and the Trust. Thus, plaintiff actually has not alleged a separate or unrelated claim for relief by the additional allegation of misrepresentation to plaintiff.[6]

---

[6] The characterization of plaintiff's second allegation of misrepresentation as more in the nature of a second count of the underlying claim for relief for intentional interference with contract is actually unnecessary as ORCP 23 C. provides that a new claim in an amended pleading relates back if it arises out of the same conduct, transaction, or occurrence as that in the original pleading.

The narrowed issue, then, is whether the allegations of misrepresentation to plaintiff relate back to the filing of the original complaint. ORCP 23C., effective January 1, 1980, applies to cases pending on that date. It provides in pertinent part:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. * * *"

This part of ORCP 23C. has not yet been judicially interpreted in Oregon. Although the rule is identical to Federal Rule of Civil Procedure 15(c), federal caselaw is not particularly helpful because the Oregon Rules of Civil Procedure specifically reject the federal approach of notice pleading in favor of the retention of fact pleading. ORCP 18A. As noted in the Commentary to the Oregon Rules of Civil Procedure: "The necessity of pleading ultimate facts retains the present Oregon requirements of pleading facts at a fairly specific level." Merrill, Oregon Rules of Civil Procedure: A Handbook 36 (1981). The focus in this state before the adoption of ORCP was upon the "important operative facts." *Campbell v. Ford Industries, Inc.,* 274 Or 243, 254, 546 P2d 141 (1976). The "common core of operative facts" is the focus under federal rules. 6 Wright and Miller, Federal Practice & Procedure § 1497, 495 (1971).

Notwithstanding the differences between notice pleading (federal) and fact pleading (Oregon), it is clear that the legislature chose the more inclusive federal language in permitting amendments to relate back not only when the reference is to "conduct," *See Campbell v. Ford Industries, Inc., supra,* but also when the reference is to the "transaction" or "occurrence." ORCP 23C.

The apparent rationale for allowing a post-limitation amendment to relate back to the pre-limitation pleading, and thereby defeat the statute of limitations, is that a party who is notified of litigation concerning certain conduct (*Campbell, supra* 274 Or at 254) or a given transaction or occurrence through the original complaint, has been given the notice that the statute of limitations was intended to assure. Wright and Miller, *supra* § 1496, 482-83, § 1503, 535.

■ Defendants and the dissenting opinion in this case in the Court of Appeals contend that the new allegations of misrepresentation by defendants to plaintiff denote different conduct than originally encompassed by the allegations of misrepresentations to the Trust. Were we to ignore the broader language in ORCP 23C. ("transaction, or occurrence") we would agree. However, we cannot ignore the dictates of the new rule.

The three latch-key words of FRCP 15(c) were examined by one author with this explanation:

> "In order to prevail, the plaintiff must possess a claim that entitles him to relief. In light of that requirement, the realistic meaning of the terms 'conduct,' 'transaction' and 'occurrence' as contained in Rule 15(c) becomes obvious. The term 'conduct' refers to the acts and/or omissions of the parties as set forth in the original pleading. It may or it may not include the respective acts and omissions of both the plaintiff and defendant. The term 'transaction' includes the acts and omissions of the parties leading to the injury or injuries complained of, plus such injury or injuries. More specifically, the transaction encompasses everything the plaintiff and defendant were allegedly doing, together with all resulting injuries to either or both parties. Since the 'transaction' includes the acts and omissions of both parties at the time and place of the plaintiff's injury, it is readily seen that the Rule 15(c) transaction is broader than the Rule 8(a) claim for relief. The term 'occurrence' refers to a happening set out or attempted to be set out in the original pleading. It can refer to a single act, omission or injury. * * *"

Smyser, *Rule 15(c) Relation Back of Amendments: A Workable Test.* 23 SDLR 55, 56 (1978).

In plaintiff's first claim for relief, he alleged conduct interfering with his contract with the Trust. In his second claim for relief or count, plaintiff alleged other conduct interfering with the same contract substantially at the same time, albeit interference with the other party to the contract. Thus, the claimed misrepresentation to plaintiff unites with the originally pleaded misrepresentation to the Trust to cause the single injury alleged in the original complaint. We conclude that the additional misrepresentation arose out of the same transaction pleaded in the original complaint and relates back.

As a final note, we are admonished to construe the pleadings liberally with a view of substantial justice between the parties. Plaintiff contends, and we do not find to the contrary, that defendants assert no prejudice by the addition of the new allegations. *See Brackhahn v. Nordling,* 269 Or 667, 672, 526 P2d 221 (1974).

This segment of the Court of Appeals' opinion, reversing the trial court is affirmed. The case is remanded to the trial court.